Argument not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. Mr. Ellison, you may proceed. Good afternoon. Philip Ellison appearing on behalf of the appellant. I'm reserving three minutes for rebuttal. Your Honors, the issues before you today are two in number. The first one is shared by both defendants and the second one is by the crew barbershop alone. The issue that's before you today is the shared issue is the 60% rule that's found at the 2010 ADA standards at 206.4.1. It's our position that the judge below too narrowly construed that provision to be an issue about the treatment of a door as opposed to a treatment about ADA access to the whole of the unit. I know you said there's two issues. There might be a third issue. So I just want to talk about standing for a second, which has been raised a little bit but not a lot. So what's your theory of standing for your client? My client actually attempted to actually present herself at this business itself and could not access the business. She just supplied an affidavit that's in the record. Standing's not been challenged directly by defendants. Does that matter? Well, the Supreme Court just came down this past week about party presentation, and I acknowledge that the issue involving this does go to jurisdiction. Standing can go to jurisdiction, but it's not been raised as an issue by either parties on this. Point taken. She said that she was previously going to go to the barbershop to buy gift certificates for her sons who live out of state. That is correct, who was visiting during, I believe, the Christmas time frame right there. And she did in her affidavit say, if I could access this, I would come back to this facility, to this business, to access those services. For what reason? To buy certificates, gift certificates, as I can best recall. So she never actually bought gift certificates, right? She did not because she could not access, that's correct, because she could not access the facility. I didn't think her declaration was quite that specific. Because obviously there was also the coffee shop involved, which was closed. The coffee shop. She originally went to the, and forgive me, I'm going strictly from memory because this was not an issue, but my best recollection is she went to the coffee shop first with her friend and then attempted to go, which is in the same building, went to the barbershop to buy the gift certificates and was unable to find the location and could not access the front of the building because it says it goes to the stairs, which of course gets us to the 60% rule that we're here about. I'm not trying to trip you up, but these are obviously threshold questions. You come here a lot. Sure. Very fluid. She does say that she would return. She doesn't say why she would return. Would she return because she wants to continue sort of monitoring the property to see whether it's compliance? Would she return to buy a gift certificate? She's never bought one before, but why? This does not say why she was going to return. It said she would return, but the declaration or the affidavit doesn't say why. And the deposition didn't really seem to lock that down much either. So I can't speculate right now as to why. I mean, my understanding is my client is a resident of this town and would be a user of those services in that respect and would be accessing these places of public accommodation for these services. If that issue had been raised, we would address it obviously with a further affidavit. Maybe we should remand? I mean, who has the obligation to show standing? We have an obligation to show standing. We believe we've done that with the affidavit. If we failed to do that, that would be raised by my opponents and we would address it in the district court as a matter of first instance. If the court would like further briefing or further submission of affidavit, we would welcome that here or welcome that back with district court. Do you want to submit evidence here? I'm just thinking through your possibility.  We could submit an affidavit from the client to this court maybe attached as a 28-J. I've never actually submitted an affidavit to this court before. I've submitted lots of 28-Js, but not any in that nature. If no one else has questions on it, you can go to it. Fair enough. I appreciate it. I would point out, I guess getting back to where I was started on this, is we have two issues that have been briefed to this panel today. One, as I indicated, was shared between the two parties, which is the 60% rule. It's our position that the district court treated the ADA issue as a door issue as opposed to an accessibility issue. I would point this court to two reasons why that's wrong. As I did in the brief as well, this applies under the 2010 ADA standards. It's 206.4.1, which points in the most kind of unusual structuring of a standard by the federal government, but it is a standard that says you need to comply with 404. If we go to 404, 404 points us to 303 and incorporates it specifically. 303 and 303 is the ramp provisions that's required. If there's anything more than a half-inch difference between what I would call ground grade and the door itself, which here we're almost 14 inches above the ground, it requires a ramp, not stairs in this instance. There's another section that talks about ramps, though, right? It says that every building has to have some means of accessibility. Section 405. 405. So we're not in 405 because the reason being is that our position is that the place of public accommodation is in Unit 1C, the actual barbershop itself. When we had Drip Drop Drink, obviously it would have included them as well as a separate place of public accommodation. What's happened in this time is that Brother Counsel has turned this issue of public accommodation into the building itself, and that's not what a place of public accommodation is. At least in our view, it is the actual unit itself that's been leased by the... Now, if we're wrong on that, we've briefed that in the lower court. That's been fully briefed as an alternative argument. We have attached as Exhibit 60-2 in the record a copy of the diagram that shows all the entrances and which ones are considered public, which ones are considered restricted, which ones are considered service entrance. No matter which way I try to count them from which direction, we don't get to the 60 percent marker that's required. But I want to be clear, our primary argument and the way we pled the complaint is that these individual units are the places of public accommodation. But under your current theory, there's two entrances to Crewe, right? That is correct. So under your... I appreciate your sort of regulatory interpretation, which I don't want to get away from, but I had a couple of sort of big-picture thoughts. One, if Crewe blocked off the front door, so we're not going to use this front door anymore, they would be in compliance. That would be correct. That's like a really odd circumstance. The law sometimes allows for odd circumstances. I would have to concede that if they would have one entrance then, and that one entrance would be the back door, which would then be accessed through the vestibule entrance in the front. In that case, they would have a 100 percent rate in that regard. Is that because the ADA is about discrimination and if nobody can use that front door, then you're not really discriminating against people who are able-bodied and who are disabled? Exactly. It's about having equal dignity is the phrase I would use, is that everyone is to be treated equally. We only have one door, and that one door is everyone is treated the same discourteous way to come through the back. Then everyone is treated equally in the most discourteous way possible of coming through the back door. I would acknowledge that is a weird result, but it is... Being discourteous places from having multiple entrances, but... Well, no, we... Can I ask you one other question? Sure. A big picture question. Your approach applies to every public accommodation, right? That would be correct. So every McDonald's, every mall, every hotel in the country should be following your interpretation. In other words, every one of those public accommodations should have at least 60 percent of their entrances accessible to disabled individuals. Well, I would argue this is not just my interpretation. This is the Justice Department's interpretation as well. But to your point, yes. A follow-up, if that's true... That is true. You would think there would be a massive number of these cases, and I don't know, are there any other cases in this area? It's just new builds, right? It's not like if I go to a McDonald's and don't see it. It might be because McDonald's was... Well, there's a couple of things that can come into play. It's a lot of new buildings. I mean, there's thousands and thousands. There's lots of buildings on this respect. I would just say, I mean, the cute answer would be is that I'm a very creative attorney that finds unique areas of questions of the law to bring to this court. But... The DOJ has put it out there too. But the argument could be is the fact the DOJ has issued, in fact, we have with us, it's the ADA Title III Technical Assensus Manual, which gets its hour deference on this, is that their interpretation provides that this means that these rules apply to everyone, and the argument would be, at least as I can see it, is when I come up to any building that I see that has stair steps to it, they automatically have the ramp. Now, there may be some buildings that don't meet the count for new builds in that respect, and those would need to be challenged at the appropriate time, at least is my expectation. When I walk into... It's been in existence since 2011? Well, the ADA's been in existence since 1990, but... The current interpret, the 60% rule. The 60% rule is in... There's a lot of buildings since then, is my point. It's surprising to me that there hasn't been a single other case where someone has made this argument, let alone one on it. I was going to say the one would be Kong, would be the Kong from... That was all different. And I acknowledge, I mean, that would be the one case in that respect, but this was a case that was brought to me in the fact that this was a woman who suffers from a disability, and there's been no question she suffers from a covered disability, and she can't access the services on the same equal dignity as a member of the public. Now, the question becomes is, at least for purposes of where we are in this case right now, is there's really two questions that the lower court judge answered that got the case here. There are still more questions, I think, that need to be answered by the trial judge in due course, but he concluded that the 404 applies essentially... And this is my way I would phrase it, is door hardware. I think that's an overly too narrow view of what's required under the 60% rule. It deals with access to public entrances. And the way I can kind of prove that I'm right in this understanding that it's greater than that in that the trial judge referenced but didn't analyze correctly is the definition of entrance. But that regulation doesn't deal just with hardware, doorknobs or something like that. It deals with the width. It deals with thresholds. All things that are integral to the door opening. Is that a fair assessment? That is one piece of 404. That is correct. So what I don't understand is, as I understand it, prior to 2011, this 60% rule didn't exist. It was 50-50. That was correct. And I think we could all agree that there are hundreds if not thousands of places of public accommodation that have two entrances, a front entrance and a back entrance. In theory, yes. Make sense? Sure. So you could have a ramp under the old regulations. Correct. You're saying now every one of these two entrance stores, for lack of a better way to put it, can't have a ramp on one of those, excuse me, can't have steps on one of those entrances because they don't meet the 60% rule. I guess let me leave with this thought. They can have steps. They have to just have a ramp as an alternative to that entrance, much like when I walked into the courthouse. Whether it's a ramp alone or a ramp with steps, there has to be a ramp. There has to be a ramp, yes. So why, if that was what they were trying to accomplish, did they reference 404 and not 405, which is the regulation that deals with ramps? Because 405 deals with buildings. 404 deals with places of public accommodation. That's the difference right there. 405 is a broader building-based regulation, and 404 deals with individual, because 404. Places of accommodation are not subsumed within 405? You can have multiple places of public accommodation within one building itself, and this is a prime example of that. So in this instance, each unit, to the extent it's divided off as a separate business unit as a place of public accommodation, is defined by both Congress, by statute, and by the regulation. It's covered by this regulation on that. And that's where Kong kind of uses it. Kong is the best case I've got, of course, because it's the only one really out there, as we've discussed. It says you've got to hit the 60% mark. If you don't like the 60% mark, call your legislator. You don't get to just ignore those regulations going forward. I guess I'm a little confused about 405, because it seems like, as we do in many of these regulations, you have a little bit of a, like, one points to another points to another. And it does seem like even from 404, you get to 405, right? Like, if you have a change in level of a doorway, which is in 404, it sends you to 303, right? Right. Now you're in 303.4, which is ramps, and what does it do? It sends you to 405, right? So you're getting there. I mean, it's a lily pad. Either way, you have to have the ramp. The difference, though, between 404 and 405 is the number of ramps that you get. Right, the number of ramps, but in terms of the specifications. Correct. Once you get there, and my position ‑‑ I'm sorry, if I may continue. The way I would analyze this very carefully is you have, you know, your 206.41 60% rule, which points to 404. 404, which is your 404.2.5, points to 303. And it's undisputed, there's stairs and no ramp. And it's not that the stairs were a design feature. The architect has offered an affidavit that he designed this building with those ramps. They went away. And no one has been able to explain to me what happened to those, because I asked in the court below, and no one seems to be taking the responsibility as to why these were changed. We have a theory, but we haven't been able to verify those as to why we think it's an aesthetics issue for the town that was redeveloping its downtown. But it doesn't matter, really, in all honesty, because it doesn't matter. Can I ask just one more issue about the interaction between the kind of earlier version of the regs and then the 2010? We had this 50% rule. Now there's 60% with a change in language, as Judge McKee talked about. If we were to adopt the district court's reading of the 60% rule that it's just 404 doors, door hardware, door spaces, do you still have to have 50% actually accessible, or is it that new builds are only required to comply with kind of the least regs of the most recent regulatory system? With due respect to the lower court judge, I can't reconcile those positions together in that way that he did. And I'm trying to answer your question in that respect, because his theory, as he came up with it, he said these stairs are outside of the door. Right, I understand that. And so if it's outside the door, then the steps and the stairs have nothing to do with the 60% rule. So it would be if this court adopts the narrower view that 404 is, and this is my phrase, it's just the hardware, right, then the 60% rule would not be implicated. Right, but does that reignite the 50% rule? No, I don't know. And the only reason I say that is because the 50% rule comes from the prior regulation from the pre-2010 builds. This place was built after 2012. It is completely subject to the 2010 design elements alone. There is no retroactive backwards look for the previous. They kind of built in a retroactive, but I think almost kind of a non-conforming use style minimization theory to help old. I have a building that I work in that's older than that. We had to retrofit part of it because it was there, but we do get some time in and some exceptions to be able to make it comply in that respect. Right, and if you do updates, you have to update to kind of the most recent regs, not to old regs. When we redid my office, that's exactly what we had to do in that respect. I have more, but I am out of time, but I'll talk more on rebuttal. Good afternoon, Your Honor. Your Honor, Peter Bosch on behalf of the appellate HSD to LLC. I believe Judge Maloney's opinion from back on October 7th of 2025 was spot on. I think the court understands the issues. He indicated that he believes the 2010 standards applied to doorways, the widths. I have a standing question just to get that out of the way. Are you contesting the standing here? I contested it in the response of pleadings I filed in my affirmative defenses. I certainly hinted on that. What's your position today? Do you think the plaintiff has standing here? And if so, why? I don't think her standing passes the smell test. I mean, I took her debt. I don't know about smell test, but if she says she's going to go back to actually use the facility to buy a gift certificate, do you think that's enough? I question that. I took her debt position. I had trouble reading the record. Did you have a better understanding of why she might? She said she would go back. Do you understand why? Was it for testing? Was it to buy something? Mr. Ellison and I were here on her daughter's similar lawsuit against this very development. We were here in 2010. Judge Neff threw it out because her daughter said, you conspired to violate the ADA. My client individually, not as HSD or not as LLC. The city of Muskegon, the disability network, so we were here, and that was a conspiracy that Judge Neff threw out. The discord then upheld saying there was no conspiracy. So, ironically, two years later, the mother, who has a disability, says, hey, I went there on one occasion, and the door was locked. I took her debt position. She said I was there on February 16th of 2022 with a friend. I could get in. But I'd been there earlier, and the door was locked. I said, do you know what day it was? No, it was sometime before. But I was there on the 20th of February 16th. I was just asking about returning. I think we all have agreed she's gone once. She said she wanted to buy a gift certificate. But if you don't have a position on it, that's also okay. I think it is very sketchy whether or not this court is going to say that standing, and I certainly hinted at it in my responsive pleadings and my affirmative defenses and in all of the briefs, saying, boy. Because what Mr. Ellison then does is he supports that with subsequent affidavits saying, well, this is what she was going to do. We're just trying to get you to say that your position is she has standing or she doesn't have standing. I don't believe she does. It's sketchy. It's not an answer. Okay. I don't believe she does. The court's going to say on the one occasion if you come up with some sort of pretext that you were going to use it, that's enough. Boy, that means everybody gets in. And that really bothers me, especially given the fact that I had to deal with her daughter on a similar issue. She says she's going to come back. Correct. It seems to me what you should be focusing on is she doesn't say whether she's going to come back as a tester, and that's one question, or she's going to come back because she still wants to buy more gift certificates. I think the case law says if she's a tester, that gives her enough. I tried to nail that down with her and I couldn't get anything. You're saying you think if she says she's coming back not to patronize the store but to test, that's okay. That gives her standing. I don't believe the law should say that. I believe there's some case law that does that. I'm just trying to figure out what your position is. My position is that Judge Maloney's decision was correct and that . . . Did he address standing? He did not address it. That's okay. Maybe we should move on to the next . . .  Again, I believe that Judge Maloney properly addressed the 2010 standards and simply said that she's met the 2010 or this building has met the 2010 standards, and even if they didn't, there's still three of the five entrances are handicap accessible. Do you agree that the doors needed to meet, that while you didn't have to do maybe all the things of an accessible route, like Judge Maloney said, that you had to comply with all the requirements of Section 404? We did that. In fact, I . . . I'm not asking factual questions. I'm asking legal questions about do you think the law at least requires you to comply with all of 404? Yes, I do. Okay. 404 requires that there be maneuvering clearances, right? You have to have like five foot of area or things like that, right? Why does it make sense to need to have a big amount of maneuvering clearance to a door that there are stairs up to that someone who needs to maneuver in a wheelchair could never even get to? Well, that would be how they access because here we have a corridor, and that corridor has two entrances that are both handicap accessible. So we need to make sure that those doorways are accessible for . . . But like from the outside, right? You have to have maneuvering clearances outside the door, right? Right. Under 404. Right. So why does that make any sense to need to have a space to maneuver your wheelchair into a door if you had to get up steps to get there? It wouldn't make sense if you had to get up steps to get up there, but once you're inside the buildings, they want the doorways inside the buildings to be accessible. And that's what Tracy McManus, who was . . . But then why have a maneuvering space outside the door? That's my question, not about maneuvering space inside the door. Why have to have . . . You have to have maneuvering clearances on both sides, right, up to about four or five feet in this table. Sure. Why does that make sense? That is inconsistent. So it's inconsistent. What about revolving doors? Revolving doors are certainly going to make it difficult for handicapped individuals, and I think that's what Judge Maloney said, is that when you talk about revolving doors . . . But you could have some steps up, and then we make sure you just don't have, you know, a revolving door. Then that's okay. Why do you think the height of the hardware matters? I'm not sure on that. Certainly with the door on how they're going to get in, I think Tracy McManus was one of the architects talked about this. She said there were some of the things on the widths of the doors . . . Right, the widths of the door. Why should the widths of the door be wide? This was in the quarters that are handicap accessible that she wanted . . . But you told me that you have to comply with 404. Right. For all your doors. Right. Including the door that has the stairs right now in the front. I believe that's correct. Why does it need to be wide? Why would the regulations require the door to be wide, like a particular wide width? And again, I'm not . . . I think there's . . . So, like wheelchairs could get through? Wheelchairs can get through, but if we're going to have a 60% accessibility . . . Right, so 60% have to be wide enough for a wheelchair to get through, right? Under 404, 60% have to comply with 404, right? I'm not sure I agree with that, given the inconsistencies between the 1991 standards and the 2010 standards. Judge Maloney said that 60% have to comply with 404. Are you now saying you disagree with that? No, he did say that and I agree with that. Okay, so 404 then requires door widths to be a particular width, right?  Okay, so 60% of doors have to be wide enough for a wheelchair to get through. Correct. But you can put stairs up to those doors. I believe that's what Judge Maloney said. Why does that make any sense? It makes any sense that we have an inconsistency. And then the inconsistency is that you're going to have on these two-door buildings, because I believe the 1991 standard says you need two exits . . . But we're in the 2010 standards. I don't think anybody disagrees which set of standards we're in. So we can talk about the 2010 standards. Why does it make sense at all that we're going to require 60% of your entrances to have these big maneuvering spaces, to be nice and wide, to make sure the threshold is completely flat, not more than half an inch, all of those things, but we could put stairs up to it. And I don't know if that's for down the road or . . . What about a walker? If they had a walker, it's a little wider, maybe they need a little more space. It could be somebody . . . People with a walker can do stairs great. I'm sure they love that. Not every disabled person is in a wheelchair. Sure. There are people that are disabled that might need more room. And so that someone . . . we're just going to make it wider and more accessible. Wider and more accessible makes it easier for anybody with any number of disabilities. Does anything but the door need to be wider? Could you put a slot canyon in front of it? You've got to make your way through hedges or slot canyons and things. You would comply then with the ADA as long as your door is wide enough? I think that if you're complying with the door, and it talks about, as Judge McKeague said, the width, the turnstiles, the platform, any number of things, and I think that's how Judge Maloney read the standard, and our architect says we are in compliance with that standard. The question then is, are we in compliance with the 60% rule? And Judge Maloney says, I believe we are because three of our five entrances are handicap accessible. But now you're telling me about three of the five overall. I'm taking a different question. If we're just looking at, like, one of the tenancies and the two doors, or we can even take a hypothetical place that has two doors, right? And you're then saying that 404, as long as your door is wide enough, that's all you need? I think that's correct. That's what I am saying, yes. Why would the Access Board make regs like that? Like, how much of the population is helped by making sure that the hardware is low and it's wider and you have five feet of maneuvering space and all of these things, but you've got to get upstairs, maybe you've got to go through, you know, narrow tunnels and spaces. What percentage of the population is helped and given access, right, by that? I think that a wider, bigger door is better for everybody, whether you're handicapped or not, getting things through, any number of things. If I have to get a person through with additional, with a luggage, with a carry bag, whatever. Wow, I didn't realize the ADA was about luggage and carry bags. Well, I'm just saying that it's going to be better overall. The alternative is that we're going to have three entrances to a building. Two out of three have to be handicap accessible or... What percentage of entrances have to actually be accessible under your rule, under your reading of the regulation? 50% or 60%. 60%, I believe. Well, why does 50%, why do the old regs just magically kick back in? Like, this is a new build, right, so you have to look at the new regs. If you're saying 60% only has to comply with 404, and you've got your nice wide doors for your people with their luggage and the nice low, you know, door handles and things like that, why does the 50%, where does 50% come from? If you're looking at your average, any building, two entrances, you're going to say that you might just... I'm not looking at buildings, I'm looking at the law. I'm wondering where it comes from in the regulations. It seems to me if we're saying 60%, we're saying anything over 50%. So we might as well be saying that you need to have the majority of your, more than a majority of your entrances have to be ADA approved. I don't believe that that's what the law says. I'm wondering, if you're not saying that 60% have to be fully accessible, because I understand your argument. 60% have to be nice and wide with lots of maneuvering space, but not actually have ramps, not actually be accessible. I'm wondering how much, where in the law tells us how many percent do indeed have to be accessible, or not a percent, like just how many. 60% is what 2010, at least that's what Mr. Ellison says it is. But you say they don't have to be fully accessible with ramps and things. You just said that's just 404, that's just the door width, the door handle, the door maneuvering space, and you can have stairs. Oh, I'm not saying that at all, no. I am saying that 60% have to be ADA accessible with ADA either no entrance. No, I am very sorry that I misunderstood your argument. That's probably why I'm frustrated. No, I'm sorry, I'm sorry, Your Honor. I believe that 60% have to have ramps, they have to be zero-level entrance, that 60% have to have that. It's just you're thinking about like building-wide as opposed to each dependency.  Oh, I'm sorry that I misunderstood your argument.  Okay, I apologize. Okay, so 60% do indeed have to comply with the ramps and all of those sorts of things have to be accessible. It's just that this building is fine because overall, if you look at all of the entrances. We have five entrances and three of the five are in compliance. Gotcha. And that's what this Court of Appeals said before back in 2022 when the same issue was raised with a different plaintiff, the daughter of our current plaintiff. If we were to reverse Judge Maloney, do you agree that it's your client's responsibility to remedy this and not crew hair? I agree with that, yes. I believe we're the landlord and we're the ones that have control. I would agree with that. Good afternoon, Your Honors. May it please the Court. Patrick Kukla appearing on behalf of Appellee Crew Hair. We believe that the District Court's grant of summary judgment in favor of Crew Hair should be affirmed. The District Court correctly determined that Crew Hair as a lessee of the commercial building did not have control over the exterior steps leading to the entrance to the barbershop, which formed the basis for the appellant's claim for an ADA violation. As briefed in the lower court and as briefed by the appellant in their appeal to this court, they've relied on, they've made the argument that because the lease provision requires that, and as Brother Counsel just indicated, his position is that the landlord does have responsibility if this court were to remand to make any, remedy any violations in terms of the building not being in compliance. As I understand the appellant's argument, they're claiming that that lease provision or the terms of the lease are somehow modifying around or contracting around the obligations of a public accommodation that they would have under the ADA. I respectfully think the Appellant's Counsel has misread what the law is, that the lease, as annunciated by the Ninth Circuit, the Boddison case that they relied on, that Appellant has relied on heavily, almost exclusively I should say on this issue, dealt with a landlord who had, was trying to contract around its obligations by saying that it was the tenant who had the obligation under the lease. That's not the situation here, and the Ninth Circuit declined to extend their ruling in Boddison in the Kohler case, which Judge Maloney relied on in arriving at his opinion in order of granting us summary judgment. I would submit that we are not. I'm trying to figure out where we're going here. You're allocated eight minutes, and HSD is allocated seven. Are you using your eight minutes just to say, look, if there's a problem here, it's not our problem, it's their problem? Essentially that is correct. So you're not here speaking to the underlying merits that Mr. Bosch was addressing? No, I don't think that would serve any purpose. Why on earth did you guys divide your time up this way? That's an unfair question. I withdraw that. I think the reason we did that is because, one, our crew here was granted summary judgment based on Judge Maloney's application of his reading under Kohler that there has to be some ability that the public accommodation has to have some control over the area that's causing the discriminatory act. And then at the same time, procedurally, plaintiff appellant had filed their own motion for summary judgment. And on the same day, Judge Maloney issued two orders, one denying the appellant's motion for summary judgment based on his reading of the statute in the connection with 404. Then he also granted our crew here a separate motion for summary judgment on the basis that we do not have control over the exterior steps of the premises. So both issues were briefed. I know Mr. Ellison started to mention that there were two issues. I know Your Honors mentioned Puntenshaw, the third issue, was standing. The second issue is really what I was addressing because I think that only relates to crew here. It doesn't relate to the owner of the commercial property. Can I ask you a question about that? Just to make sure I understand your argument, as I misunderstood the other argument, so I want to clarify. You're just saying under the terms of this lease, we don't have the power to essentially do with the lawsuit, build a ramp. We're not allowed to pour concrete outside. We're not allowed to do things. But things that would maybe be under your control, like if you have a lot of planters out there or if you have boxes in a hallway that's supposed to be accessible, you're not trying to disclaim any of that stuff. It's just because these are structural issues that the plaintiff is talking about. And they're not part of our leasehold because we're leasing I think approximately 920 feet of the storefront plus a back storage room. We're not leasing the exterior of the building. And so I think that draws us into a very analogous situation to Kohler where the Ninth Circuit said that Bed, Bath & Beyond, because the parking lot in front of the store was a common area, Bed, Bath & Beyond as the tenant wasn't responsible for the alleged handicap, not having handicap parking and accessibility to disabled individuals in the parking lot. And that's the same thing here. So it's not a situation where we're saying, well, we have an obligation under the ADA and we're trying to contract around it. That's not what we're saying. Our position is we don't have an obligation from the beginning because the only obligation we would have would be arising out of our leasehold, unlike the owner who has a responsibility regardless of whether they're leasing it or not. And so they can't go around and say, well, yes, I have an obligation under the ADA. I'm going to bump that down, kick that down to my tenant. Here we only have an obligation, if any, based on our leasehold. Our leasehold doesn't include the exterior. We have no ability. And, again, I know it came up in the lower court briefing. Our position was described as application of common sense. I mean, we couldn't go. If this case were to be remanded and the plaintiff were to prevail, we have no ability to go knock down these steps and start pouring concrete. In fact, we'd be in violation of our leasehold and be subject to a lawsuit. It seems to me that you're going just a little bit too far in trying to convince us of this. Certainly you have economic power. You could say to the landlord, we're out of here if you don't fix that, and you're going to have an empty store. So you have the ability to influence the landlord. I just think you're taking your argument one or two steps too far here. We could influence them, but there could be another. You don't have the ultimate responsibility. You've said that now 17 times. But you do have the ability to influence the landlord, right? So maybe that's what Mr. Ellison is going after here. We don't know. We'll ask him when he steps back up. The only thing I would say to that, Your Honor, is I guess you could have a situation where there could be some economic influence. In your hypothetical, if we were to say, yes, if you don't fix this, we're closing up, we're leaving. I'm not sure under the lease what the ramifications were. If there's a provision where if the landlord doesn't do what they're supposed to do, can we terminate our lease and move out? But economically, looking at it from the landlord's perspective, there could be, and I don't know the realty market in this area where this building is, but there could be two, three, four other businesses willing to come in there and fill that space. So I'm not sure how much practical influence we actually would have. Thank you. Okay, thank you. Brother Counsel is correct. That was the second issue that we didn't get a chance to address. But before I want to respond to him, I wanted to point out one additional point. Talking about what constitutes an entrance, which is very important here, there is a definition that's provided under the definition section. It's 106.5. It's more than just the door. You can read through it. It talks about the approach. It talks about the vestibule. It talks about the landing. So entrance, with that definition tacked on to 206.4.1, is not just the door. It's more than that. And I wanted to make that point on my rebuttal. To address Brother Counsel's argument, I disagree with him about Kohler providing the answer in this situation. Kohler was a situation where the landlord had complete and separate control of the parking lot altogether. Botswan, or whatever we pronounce that, dealt with a situation where the landlord shared that responsibility and tried to contract that responsibility back to the tenant. This case falls directly right between those two. And I would point this court to paragraph – What control does Crew Hare have over the step? That's what I was just going to say. Paragraph 24 of their lease agreement. I would point this court to that. It gives them the right to make improvements to the property, but they still have to get permission from the landlord that will not be unreasonably withheld. They had shared control of that front area of that property. So this case is kind of unique in that it falls between those two extremes at the Ninth Circuit. I would advocate to this court that Botswan is the proper standard this court should adopt completely because that would be totally consistent with 28 CFR 36.201B that says both the landlord and the tenant are equally responsible at a place of public accommodation being subject to this requirement. Now, where I think Brother Counsel makes the mistake here is there's a difference between who's responsible under the law and who ultimately holds the responsibility liability-wise, meaning dollars and cents. They both are liable. They can allocate between themselves who ultimately has the responsibility to pay for the improvements, but it doesn't act as immunity from the ADA responsibility in the first instance. Does it functionally matter to you if you prevail against the landlord? No. No. I mean, I'll be blunt. And frankly, it's because there was uncertainty when we started this case as to who this was. But we still believe and we still take the position that both are responsible under 36.201B, and the contract under paragraph 24 provides them with joint responsibility because they both can cause the improvements to the property to be ADA. Isn't there an indemnification clause too? So like if one were in violation for essentially the acts of the other? As I understand, the landlord took responsibility for anything that violates state or municipal ordinances. But not federal law. Well, if you read the contract narrowly, it doesn't say anything about federal law whatsoever. A state law somehow incorporated? I don't know. That's a contract dispute. I won't. At least as you read it, if you read it narrowly, maybe Brother Counsel will make that concession at a later date. But as it stands, at least as I read it with state and municipal, this is federal and they're not covered by that provision. So I would point this court to paragraph 24. Unless the panel has any other questions? Thank you very much. Good seeing you today. Interesting case. We appreciate your arguments. We may adjourn court.